APPEAL NO. 16-1772

---

# United States Court of Appeals
# for the Federal Circuit

---

M-I DRILLING FLUIDS UK LTD. AND M-I LLC,

*Plaintiffs-Appellants,*

v.

DYNAMIC AIR LTDA.,

*Defendant-Appellee,*

---

Appeal from the United States District Court for the District of
Minnesota in Case No. 0:13-cv-02385

---

## CORRECTED APPELLEE'S BRIEF

---

Alan G. Carlson
J. Derek Vandenburgh
Todd S. Werner
Nathan D. Louwagie
Carlson, Caspers, Vandenburgh,
Lindquist & Schuman
225 South Sixth Street,
Suite 4200
Minneapolis, Minnesota 55402
Telephone:  (612) 436-9600
Facsimile: (612) 436-9605
acarlson@carlsoncaspers.com
dvandenburgh@carlsoncaspers.com
twerner@carlsoncaspers.com
COUNSEL FOR APPELLEES

**CERTIFICATE OF INTEREST**

Counsel for Appellee certifies the following:

1.   **The full name of every party or amicus represented by me is:**

Dynamic Air Ltda.

2.   **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Dynamic Air Ltda.

3.   **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae Represented by me are:**

Dynamic Air Inc., which is not publically traded, has a greater than 10% ownership interest in Dynamic Air Ltda. No other company has an ownership interest of 10% or more in Dynamic Air Ltda.

4.   **The names of all law firms and the partners or associates that Appeared for the party or amicus now represented by me in the Trial court or are expected to appear in this court are:**

Alan G. Carlson
J. Derek Vandenburgh
Todd S. Werner
Nathan D. Louwagie
Carlson, Caspers, Vandenburgh, Lindquist
  & Schuman, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
(612) 436-9600
Facsimile (612) 436-9605
acarlson@carlsoncaspers.com
dvandenburgh@carlsoncaspers.com
twerner@carlsoncaspers.com
nlouwagie@carlsoncaspers.com

# TABLE OF CONTENTS

Table of Authorities ................................................................. v

Statement of Related Cases ................................................. ix

Statement of Issues ............................................................. 1

Preliminary Statement ........................................................ 2

Statement of the Case ........................................................ 4

    I.     The Asserted Patents Relate to an Alleged New Use of Pneumatic Conveying Equipment to Remove Materials from Offshore Oil Rigs ............................................................... 4

    II.    DAL is a Brazilian Company That Lacks Any Relevant Contacts With the United States ......................................... 5

    III.   DAL's Contacts With U.S.-Flagged Ships Were the Fortuitous Result of a Petrobras Decision Over Which DAL Had No Control ... 7

         A.    DAL Contracted With Petrobras to Provide Services Within the Jurisdiction of Brazil ............................... 7

         B.    All of DAL's Services Occurred Within the Jurisdiction of Brazil, Including Those Performed on Ships Chosen by Petrobras ............................................................ 10

    IV.   M-I Sued DAL in Both Brazil and the U.S. .................................... 12

         A.    The Brazilian Lawsuit .......................................... 12

         B.    The Present Lawsuit ............................................ 12

             1.    The District Court's Rulings on DAI's Motion to Dismiss .................................................. 13

             2.    DAL Moved to Dismiss and M-I Received

Jurisdictional Discovery ............................................... 14

3.     The Court's Dismissal for Lack of Personal
Jurisdiction Jurisdiction ............................................... 15

Summary of the Argument ..................................................... 17

Issue 1 ..................................................................... 17

Issue 2 ..................................................................... 19

Standard of Review ......................................................... 20

Argument ................................................................... 20

I.     Even Assuming That a U.S.-Flagged Ship is a United States
"Territory" Under the Patent Act, The District Court Correctly
Dismissed for Lack of Personal Jurisdiction ..................................... 20

A.     Legal Standard ..................................................... 20

B.     M-I Failed to Show that DAL Purposefully Directed
Allegedly Infringing Activities at Residents of the
United States ........................................................ 22

1.     This Suit Concerns Purely Brazilian Business
Activities ..................................................... 22

2.     DAL's Activities Abroad U.S.-Flagged Ships Are
Insufficient to Find Personal Jurisdiction .................... 23

a.     DAL's Activities on the U.S.-Flagged Ships
Were the Result of the Unilateral Actions of
a Third Party ...................................... 24

b.     DAL Neither Commercially Exploited the
U.S. Ships Nor Received Any Benefits From
Doing Business in the U.S. ......................... 29

c.     M-I's Cases Support DAL's Position,

Not M-I's ......................................................... 32

           d.      U.S.-Flagged Ships Are Not the Same as the
United States for Jurisdictional Purposes .......... 34

C.     The District Court Correctly Found that It Would Be
Unreasonable to Subject DAL to Jurisdiction in this Case ... 37

     1.     The Burden on DAL to Litigate in the United States
Brazil Would be Substantial ........................................ 37

     2.     The U.S. Has No Interest in Policing Brazilian
Commerce ................................................................. 41

     3.     M-I Lacks Any Relevant Interest in Obtaining
Convenient and Effective Relief in the U.S. .............. 43

     4.     This Dispute Could Be Most Efficiently Resolved
in Brazil ...................................................................... 45

     5.     This Case Directly Impacts the Country of Brazil
and Brazilian Commerce .............................................. 47

     6.     When Balanced With M-I's Weak Showing of Specific
Contacts With the Forum, DAL's Showing on the
Reasonableness Prong is More Than Sufficient to
Support the District Court's Dismissal ........................ 48

II.    Dismissal Was Also Proper Because U.S. Patent Laws Do Not
Extend to U.S.-Flagged Ships ........................................... 50

A.     The Territorial Reach of the Patent Laws is Statutorily
Limited to the United States, Its Territories and Possessions  50

B.     Courts Interpreting the Statutory Term "Territory" Have
Held It Does Not Extend to U.S.-Flagged Ships ................... 51

C.     Particularly Given the Presumption Against Extra-Territoriality,
This Court Should Not Interpret "Territory" in § 100(c) to
Extend to U.S.-Flagged Ships ................................................ 53

D.      The Arguments Made by M-I in the District Court Are Unpersuasive ........................................................................... 56

Conclusion ........................................................................................... 61

Certificate of Compliance ................................................................... 63

Certificate of Service ........................................................................... 64

# TABLE OF AUTHORITIES

## Cases

*Air Line Stewards & Stewardesses Asso. v. Nw. Airlines, Inc.*,
    267 F.2d 170 (8th Cir. 1959) ...................................................................... 53

*Asahi Metal Indus. v. Superior Court of Cal.*,
    480 U.S. 102 (1987) ............................................ 29, 30, 37, 42, 47

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
    566 F.3d 1012 (Fed. Cir. 2009) ................................................ 20

*Bellisio Foods, Inc. v. Prodo Pak Corp.*, No. 07-CV-4520 (PJS/JJG),
    2008 U.S. Dist. LEXIS 90051 (D. Minn. Nov. 4, 2008) ...................... 26, 27

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
    21 F.3d 1558 (Fed. Cir. 1994) .............................................. 32, 33

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .............................................................. *passim*

*Celgard, L.L.C. v. SK Innovation Co.*,
    792 F.3d 1373 (Fed. Cir. 2015) ................................................ 36

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) ................................................. 59

*Core-Vent Corp. v. Nobel Indus. AB*,
    11 F.3d 1482 (9th Cir. 1993) ............................................... 38, 49

*Cunard S.S. Co. v. Mellon*, 262 U.S. 100 (1923) ................................. 51, 53, 55, 58

*Decca, Ltd. v. United States*,
    544 F.2d 1070 (Ct. Cl. 1976) .......................................... 51, 57, 60

*Deepsouth Packing Co. v. Laitram Corp.*,
    406 U.S. 518 (1972) ...................................................... 45, 55, 60

*Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070 (8th Cir. 2004) ......................... 20

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ........................................... 54

*ElcomSoft, Ltd. v. Passcovery Co.*,
    Civil Action No. 2:13cv18, 2013 U.S. Dist.
    LEXIS 180407 (E.D. Va. Dec. 19, 2013) .................................... 45

*Ellicott Mach. Corp. v. John Holland Party, Ltd.*,
    995 F.2d 474 (4th Cir. 1993) ................................................ 49

*Foley Bros., Inc. v. Filardo*, 336 U.S. 281 (1949) ..............................................54

*Gardiner v. Howe*, 9 F. Cas. 1157 (Cir. Ct. 1865) ............................... 57, 58, 59, 60

v

*Grober v. Mako Prods.*, 686 F.3d 1335 (Fed. Cir. 2012) ..................................... 21

*Hanson v. Denckla*, 357 U.S. 235 (1958) ........................................... 23, 24, 25, 29

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.*,
    434 F. Supp. 2d 598 (N.D. Iowa 2006) ....................................... 44

*In re TC Heartland L.L.C.*, 821 F.3d 1338 (Fed. Cir. 2016) ................................. 32

*Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*,
    205 F.3d 1244 (10th Cir. 2000) ........................................... 33, 34

*Int'l Shoe Co. v. Wash.*, 326 U.S. 310 (1945) ....................................... 20

*Johnston v. Multidata Sys. Int'l Corp*,
    523 F.3d 602 (5th Cir. 2008) ............................................. 46

*Kraft Foods Grp. Brands L.L.C. v. TC Heartland, L.L.C.*,
    Civil Action No. 14-28-LPS, 2015 U.S. Dist. LEXIS
    106515 (D. Del. Aug. 13, 2015) ................................... 32

*Kulko v. Superior Court of Cal.*, 436 U.S. 84 (1978) ........................................... 25

*Lam Mow v. Nagle*, 24 F.2d 316 (9th Cir. 1928) ................................................... 53

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ............................................. 56

*M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc.*,
    99 F. Supp. 3d 969 (D. Minn. 2015) ........................................ 14

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*,
    24 F.3d 1368 (Fed. Cir. 1994) ....................................... 45

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ....................................... 59

*McCaw v. Fase*, 216 F.2d 700 (9th Cir. 1954) ....................................... 51

*McCulloch v. Sociedad Nacional De Marineros De Hond.*,
    372 U.S. 10 (1963) ....................................... 56

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ................................... 42, 49

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ................................... 55, 61

*NTP, Inc. v. Research in Motion, Ltd*,
    418 F.3d 1282 (Fed. Cir. 2005) ................................. 58

*Norvel Ltd. v. Ulstein Propeller AS*,
    161 F. Supp. 2d 190 (S.D.N.Y. 2001) ....................................... 42

*OMI Holdings v. Royal Ins. Co. of Can.*,
    149 F.3d 1086 (10th Cir. 1998) ................................. 47

*Ocean Sci. & Eng'g, Inc. v. United States*,
   595 F.2d 572 (Ct. Cl. 1979) .................................................. 57, 60

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
   148 F.3d 1355 (Fed. Cir. 1998) ................................................ 21

*Scharrenberg v. Dollar S.S. Co.*, 245 U.S. 122 (1917) ............................ 53, 55, 58

*Synthes v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*,
   563 F.3d 1285 (Fed. Cir. 2009) ................................................ 21

*TH Agric. & Nutrition, L.L.C. v. Ace Eur. Group Ltd.*,
   488 F.3d 1282 (10th Cir. 2007) ....................................... 46, 48, 49

*Ticketmaster-N.Y. v. Alioto*,
   26 F.3d 201 (1st Cir. 1994) ...................................................... 49

*United States ex rel. Claussen v. Day*,
   279 U.S. 398 (1929) ......................................................... 53, 55, 58

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965) ................................ 38

*Vermilya-Brown Co. v. Connell*, 335 U.S. 377 (1948) .......................................... 51

*Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007) ........................................... 44

*WesternGeco L.L.C. v. Ion Geophysical Corp.*,
   776 F. Supp. 2d 342 (S.D. Tex. 2011) .................................. 10, 48

*Westerngeco L.L.C. v. Ion Geophysical Corp.*,
   791 F.3d 1340 (Fed. Cir. 2015) ..............................39, 43, 44, 55

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) .................................................. 28, 29, 30, 38

*Worldtronics Int'l v. Ever Splendor Enter.*,
   969 F. Supp. 1136 (N.D. Ill. 1997) ............................................ 32

*Wortham v. KarstadtQuelle AG* (*In re Nazi Era*
   *Cases Against German Defendants Litig.*),
   153 F. App'x 819 (3d Cir. 2005) .............................................. 48

*Xtera Communs., Inc. v. TPACK A/S*,
   No. 2:09-CV-263-TJW-CE, 2010 U.S. Dist.
   LEXIS 110349 (E.D. Tex. Sept. 1, 2010) ................................. 25

**Statutes**

35 U.S.C. § 105 (2012) ............................................................. 59

35 U.S.C. § 271 (2012) ......................................................... 50, 52

35 U.S.C. § 100 (2012) ...................................................... *passim*

35 U.S.C. § 154 (2012) ............................................................. 50

**Other**

Fed. R. Civ. P. 4(k)(2) .............................................................. 21

H. Journal, 41st Cong. 2d Sess. (1869) ...................................56

S. Journal, 41st Cong. 2d Sess. (1869) ...................................56

Outer Space Act, Pub. L. No. 101-580 (1990) .......................59

Patent Act of 1836 ...................................................................57

Patent Act of 1870, ch. 230 § 22, 16 Stat. 198 ......................56

Patent Act of 1952 ............................................................*passim*

S. Rep. 101-266 (1990) ...........................................................60

S. Rep. No. 82-1979 (1952) ...................................................56

United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833
    U.N.T.S. 297 .......................................................................10, 48

## STATEMENT OF RELATED CASES

No appeal in or from the present civil action has previously been before this Court or any other appellate court.

There is no case pending in this Court or any other court that will directly affect the Court's decision here.  A decision by this Court raised herein could affect a pending case related to this dispute, *M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc.,*, No. 14-4857 (D. Minn.).

## <u>STATEMENT OF ISSUES</u>

The issue raised by Appellants' (collectively "M-I") appeal brief is:

1.      Did the district court correctly find there was a lack of personal jurisdiction over Appellee Dynamic Air Ltda. ("DAL"), a Brazilian company that performed services in support of the exploration of oil by Brazilian oil rigs in Brazilian jurisdictional waters pursuant to a contract it executed in Brazil with a Brazilian state-owned customer, where the only alleged specific contact with the United States is that the customer directed that some of the services be performed on U.S.-flagged ships?

In addition, M-I's appeal raises the following dispositive issue of statutory construction as an alternative basis to affirm the district court's dismissal:

2.      Is a U.S.-flagged ship a "territory" of the United States under 35 U.S.C. §100(c) such that a patentee may assert infringement of a U.S. patent for acts committed on such a ship regardless of its physical location?

## PRELIMINARY STATEMENT

This patent dispute arises out of services performed within the jurisdiction of Brazil pursuant to a Brazilian contract.  (Appx1340-41.)  The contract was awarded by Petroleo Brasileiro S.A. ("Petrobras"), a Brazilian oil exploration company that is partially owned by the country of Brazil.  (Appx780.)  Petrobras issued a Request for Proposal ("RFP") seeking a vendor to remove drill cuttings from its offshore oil rigs using pneumatic conveying equipment.  (Appx1340.)  DAL and M-I's "sister company," M-I Swaco do Brasil – Comercio, Servicos E Mineracao Ltda. ("M-I Brazil") were among the Brazilian companies that bid on the contract.  (*Id*; Appx1711.)  DAL won the bid.  (Appx1340-41.)

After losing the RFP to DAL, M-I and M-I Brazil sued DAL for patent infringement in Brazil, alleging that DAL infringed M-I's Brazilian patent relating to pneumatic conveying of drill cuttings by performing under the Petrobras contract.  (Appx566-69.)

Seeking additional leverage through redundant litigation in a second forum, M-I subsequently filed the present suit for infringement of U.S. counterpart patents to its Brazilian patent.  (Appx132-34.)  M-I's only "hook" for asserting infringement of its U.S. patents was the fact that two of the ships where Petrobras directed DAL to install and operate its equipment pursuant to the Petrobras contract were U.S.-flagged ships.  Invoking the common law metaphor that a ship

is part of the "territory of the flag which she flies," M-I argued that U.S. patent laws govern DAL's activities on the two U.S.-flagged ships, even when those ships are located off the coast of Brazil.  (Appx279-90.)

The district court dismissed the case against DAL for lack of personal jurisdiction because DAL had not purposefully directed any activities at residents of the United States.  (Appx22.)  The district court found that M-I's hook—DAL's operation of allegedly infringing equipment on two U.S.-flagged ships—was the result of the unilateral activity of Petrobras and did not qualify as a "purposeful" contact.  (Appx19-20.)  The district court also found that exercising jurisdiction over DAL would be unreasonable and unfair.  (Appx25.)  This court can and should affirm on both of these bases.

In addition, the premise for M-I's "hook" is legally flawed.  By statute, U.S. patent law only extends to the United States and its "territories and possessions," and a U.S.-flagged ship is not a "territory."  Thus, the activities on U.S.-flagged ships in the jurisdictional waters of Brazil are not relevant contacts at all.  This is a third reason to affirm the court's dismissal for lack of personal jurisdiction.

## STATEMENT OF THE CASE

**I.     The Asserted Patents Relate to an Alleged New Use of Pneumatic Conveying Equipment to Remove Materials from Offshore Oil Rigs**

The five patents in suit all claim priority to the same application and have substantially the same disclosure.  (Appx33-118.)  The patents are directed to the use of pneumatic conveyance equipment to convey "drill cuttings."  (*Id.*)

When drilling for oil in the ocean, the drill bit creates cuttings, comprised of the rock formations through which the well is drilled.  (Appx46.)  These cuttings are contained within an oil that lubricates the drill bit and serves as a carrier to bring the drill cuttings up to the rig.  (*Id.*)  Once on the surface of the rig, the cuttings-oil mixture is screened to try to recover the drilling oil for reuse.  (*Id.*)  The screened cuttings, which are still contaminated with some fluid, must be removed from the rig and transported to shore for processing.  (*Id.*)  The alleged invention resides in the alleged "surprising discovery" that it is possible to transport drill cuttings by means of known pneumatic conveying systems. (*Id.*)

The patents describe the pneumatic conveyance equipment in only general terms.  (Appx33-49.)  For example, Figure 1 shows pressure vessels 11 on the oil rig for storing drill cuttings and hoses/pipes 19, 27, 29 for transporting drill cuttings from those pressure vessels to pressure vessels 25 located on the supply ship:

4



Fig. 1

(Appx36.)  Figure 5 shows similar equipment for transferring drill cuttings from

the pressure vessels 25 on the supply ship to a container 61 on shore:



Fig. 5

(Appx40.)

## II.    DAL is a Brazilian Company That Lacks Any Relevant Contacts With the United States

DAL is a limited liability company organized under the laws of Brazil.

(Appx779.)  Since its inception in 1999, DAL has been in the business of

5

manufacturing and selling pneumatic conveyance systems in Brazil.  (*Id.*)  While DAL is 51% owned by Dynamic Air, Inc. ("DAI"), it is operated independently from DAI.  (Appx782-83.)  DAI is not involved with DAL's management.  (*Id.*)  There is no overlap in employees or directors. (*Id.*)

DAL does not have any property or employees located in the United States, or sell any products or services in the United States.  (Appx779.)  DAL is not registered to do any business in the United States, and does not have any agents for service of process in the United States.  (Appx779-80.)

Horacio Paez, the President of DAL, travels to the United States to meet with DAI only once each year.  (Appx783.)  The primary purpose of these visits is to learn about new DAI equipment.  (*Id.*)  During these trips, Mr. Paez also provides DAI with a high-level summary of DAL's activities in Brazil.  (*Id.*)  None of these trips have been made for the purpose of designing, or discussing the operation of, equipment used in performance of DAL's contract with Petrobras. (*Id.*)  Further, while Mr. Paez exchanges phone calls and emails with DAI, such communications are of an informational nature.  (Appx783-84.)  None of these "informational" contacts relates to the alleged infringement at issue.  (*Id.*)

DAL purchases certain components from DAI for use in pneumatic conveying systems.  (Appx783.)  All of the components acquired from DAI are designed for general pneumatic conveying operations.  (*Id.*)  DAI did not specially

design any components or equipment used by DAL in performance of its contract

with Petrobras.  (*Id.*)

## III.   DAL's Contacts With U.S.-Flagged Ships Were the Fortuitous Result of a Petrobras Decision Over Which DAL Had No Control

### A.   DAL Contracted With Petrobras to Provide Services Within the Jurisdiction of Brazil

The oil exploration business is highly fragmented.  Petrobras relies on a host

of service providers to help it explore for oil off the coast of Brazil.  One service

that Petrobras outsources is the operation of supply ships that transport people,

equipment and materials to and from the exploration rigs and the Brazilian

mainland.  (Appx1530, 1541)  Another service that Petrobras outsources is the

storage and conveyance of drill cuttings from the oil rig.  (Appx973-75.)  Petrobras

issues RFPs for each of these outsourced services, signs contracts with the service

providers, and then ultimately directs and coordinates the activities of the service

providers.

Around the end of 2011, DAL learned of a Petrobras RFP seeking a supplier

to install and operate pneumatic conveying equipment to convey drill cuttings

generated by its offshore drilling operations in Brazilian waters.  (Appx780.)  From

its Brazilian offices, DAL prepared and submitted a bid to Petrobras, and was

ultimately awarded the contract.  (*Id.*)  The execution of the contract and all related

activities were conducted exclusively in Brazil.  (*Id.*)  No one from DAI was involved in this process.  (*Id.*)

Pursuant to Petrobras's operating procedures, there was no negotiation of the terms of the contract.  (*Id.*)  The contract contained numerous references to Brazilian laws and regulations with which DAL was required to comply.  (Appx975, 978, 981, 984-85, 1015, 1018-19, 1023.)  Payments under the contract were to be made in Brazilian currency (Reals), and the contract provided for the withholding and payment of taxes in Brazil.  (Appx995-96, 1014.)  The contract also included choice of forum provision identifying a court in Rio de Janeiro, Brazil.  (Appx1031.)  The contract identified an operational base for Petrobras as Macae, Brazil.  (Appx976.)  It also identified six "Shipment Ports," all of which are in Brazil, and required DAL to maintain a "Support Base" in Brazil.  (*Id.*)

At the time the contract was executed, DAL did not know whether it would be required to install any equipment on supply ships.  The Petrobras contract required DAL to have "6" sets of equipment for use on "maritime units" (exploration rigs) and "0" sets of equipment for "vessels" (supply ships) "at the beginning of the contract":

3.4.3 – To have, at the beginning of the contract, the following minimal quantities of equipment for rendering the services object of present contract instrument, without harm that during performance of the contract there may be necessary additional quantities for the integral rendering of the service:

| EQUIPMENT | QUANTITY |
|---|---|
| Set of collection, storage and transportation equipment for cuttings and fluids – MARITIME UNIT | 6 |
| Set of collection, storage and transportation equipment for cuttings and fluids - VESSEL | 0 |

(Appx986.)  The contract stated that DAL "may" subsequently be requested to provide equipment for installation aboard ships.  (Appx987.)

The contract did not identify any ships.  (Appx972-1031.)  Petrobras leases supply ships that are flagged from many different countries.  The evidence shows at least eight such countries:  the Bahamas, Brazil, Great Britain, Liberia, Mexico, Norway, the United States, and Vanuatu.  (Appx1196, 1461-62.)  Thus, at the time DAL entered into the contract, it did not know whether it would ever be required to install equipment on any ships, and if so, what the flag-states of the ships would be.  (Appx781, 1176.)

The contract did, however, specify *where* the drilling rigs and any supply ships would be operated: within "JURISDICTIONAL BRAZILIAN WATERS." (Appx977.)  The contract defined "JURISDICTIONAL BRAZILIAN WATERS" as including:  (a) the Brazilian maritime waters extending 12 miles off the coast of Brazil; (b) the Brazilian "Exclusive Economic Zone" that extends 200 miles of the coast of Brazil; (c) the waters overlying the continental shelf off Brazil; and (d) the interior waters of Brazil.  (*Id.*)  These four geographic zones correspond to the

9

areas over which countries are permitted to exercise control under the United

Nations Convention on the Law of the Sea ("UNCLOS"), Dec. 10, 1982, 1833

U.N.T.S. 397.  *See also WesternGeco L.L.C v. Ion Geophysical Corp.*, 776 F.

Supp. 2d 342, 365-72 (S.D. Tex. 2011) (patent case discussing the geographic

zones defined by UNCLOS).  Nothing in the contract suggested that DAL would

be asked to perform any activity outside the jurisdiction of Brazil.  (Appx1023

("All services rendered [for the] object of this Contract shall be performed in

Brazil.").)

### B.    All of DAL's Services Occurred Within the Jurisdiction of Brazil, Including Those Performed on Ships Chosen by Petrobras

As anticipated by the contract, DAL's performance under the contract

occurred entirely within the jurisdiction of Brazil.  (Appx781-82.)  DAL designed

and manufactured equipment in Brazil, without any involvement from DAI.  (*Id.*)

The equipment was engineered and tested according to Brazilian Standards for

pressure vessels—not the standards governing U.S. pressure vessels.  (*Id.*)  The

installation and operation of the equipment pursuant to the Petrobras contract was

performed exclusively by DAL employees, all of whom are residents of Brazil.

(Appx782.)  To the extent activities were conducted on land, they were conducted

inside the borders of Brazil.  (Appx781.)  Equipment was also installed by DAL in

the ports of Brazil.  (*Id.*)

At the direction of Petrobras, DAL installed and operated its pneumatic conveying equipment on offshore oil rigs and also on supply ships.  (Appx138.) DAL operated equipment on four supply ships that were leased by Petrobras from other suppliers.  (Appx1196.)  Petrobras chose these ships.  It did not seek or receive input or guidance from DAL on the selection of these ships.  (Appx780-81.)  Two of the supply ships selected by Petrobras were U.S.-flagged: the HOS Resolution and the HOS Pinnacle.  (Appx138.)  Petrobras leased these ships from Hornbeck Offshore Services LLC ("Hornbeck").  (Appx249, 857.)  The other supply ships DAL worked on were flagged from Norway and the United Kingdom. (Appx1196.)

Petrobras also chose the locations where those supply ships would travel. (Appx782.)  DAL had no say in the matter.  (*Id*.)  Contrary to M-I's repeated assertion in its brief that the ships serviced oil rigs located in "international waters" (*see* M-I Br. at 5, 9-10, 26-27), the evidence shows that, as specified by the Petrobras contract, the ships never left "JURISDICTIONAL BRAZILIAN WATERS."  (*See* Appx782 (declaration of Mr. Paez stating that all activities were performed within 200 nautical miles from the coast of Brazil that corresponds to the Brazil Exclusive Economic Zone).)  M-I's assertions regarding international waters are unsupported by any pleading or evidence in the record.  M-I alleged

only that DAL conveyed cuttings from oil rigs "located off the coast of Vitoria

Brazil." (Appx1340-42.)

## IV. M-I Sued DAL in Both Brazil and the U.S.

### A. The Brazilian Lawsuit

After M-I Brazil lost the Petrobras RFP to DAL, M-I's first response was to

file suit in Brazil. (Appx565-778.) M-I Brazil was also named as a plaintiff in this

complaint. (Appx566.) M-I asserted infringement of the Brazilian counterpart

patent to the U.S. patents at issue in the present case. (Appx622.) M-I's Brazilian

complaint expressly referenced alleged infringement on the two U.S.-flagged

ships, the HOS Pinnacle and the HOS Resolution, that form the basis of the present

suit. (Appx569-70, 596.)

### B. The Present Lawsuit

M-I subsequently filed the present suit against both DAL and its majority

owner, DAI, alleging that DAL's activities on the two U.S.-flagged ships located

"off the coast of Vitoria Brazil" also infringed its U.S. patents. (Appx138.)[1]

---

[1] The sole plaintiff in the original complaint was M-I Drilling Fluids UK Ltd. ("M-I UK"), the British owner of the patents in suit. Over two years later, in an effort to bolster its case for jurisdiction in the United States, M-I UK granted a license to M-I LLC and then amended its complaint to add M-I LLC as a party. By the time M-I UK granted this license, however, the equipment had been removed from the U.S.-flagged ships at issue. (Appx782; M-I Br. at 10.) Thus, M-I LLC was not a licensee during any portion of the alleged infringement.

### 1.    The District Court's Rulings on DAI's Motion to Dismiss

In response to M-I's Complaint, DAI moved to dismiss for failure to state a claim.  (*See* Appx247-74.)  DAI's motion raised three arguments: (1) a U.S.-flagged ship is not a U.S. "territory" subject to the U.S. patent laws; (2) there was no infringement because at least part of the alleged infringing activity took place on Brazilian oil rigs; and (3) the infringement allegations contained no specific allegations of infringing activity by DAI.  (*Id.*)  DAI also pointed out that, while not yet served, the Court lacked personal jurisdiction over DAL.  (Appx247.)

The Court treated the motion as having been filed by both DAI and DAL, and granted the motion to dismiss as to both.  (Appx351.)  While the parties had fully briefed the issue of the geographic scope of U.S. patent law, the district court did not reach that issue.  (Appx278-90, 354.)  Relative to DAL, the Court found that "M-I ha[d] not demonstrated a sufficiently synergistic relationship between [DAI] and [DAL], such that jurisdiction over the Brazilian company [was] appropriate."  (Appx357.)  The Court also found that Rule 4(k)(2) jurisdiction was improper because (1) DAL had not been served with a summons and (2) M-I had not pled facts sufficient to demonstrate that the exercise of jurisdiction over DAL would satisfy due process.  (*Id.*)

Shortly thereafter, M-I moved to amend the judgment, arguing that the court should not have dismissed the complaint as to DAL because M-I had not yet

effectuated service on DAL.  (*See* Appx362-80.)  "Out of an abundance of caution," the Court allowed M-I "the opportunity to continue its current efforts to serve [DAL]."  (Appx385.)  The Court did not question any of its analysis from its prior decision, and explained that once M-I properly effectuated service, DAL could "then directly address the issue of personal jurisdiction if it so chooses." (*Id.*)

## 2.    DAL Moved to Dismiss and M-I Received Jurisdictional Discovery

In 2015, M-I completed service of DAL, and DAL moved to dismiss the case under Rule 12(b)(2) for lack of personal jurisdiction.[2]  (Appx405.)  After filing its brief opposing DAL's motion to dismiss, M-I belatedly filed a motion seeking jurisdictional discovery.  (Appx788-826;1105-08.)  The Court granted M-I's jurisdictional discovery concerning "whether DAL purposefully availed itself of U.S. jurisdiction."  (Appx16.)  After M-I received the ordered discovery, the parties submitted supplemental briefs.  (Appx1452-60, 1606-14.)  A hearing was held on January 22, 2016.  Neither party asked to have witnesses testify at the hearing.  The motion was submitted on declarations.

---

[2]  DAL did not again raise the issue of whether the territorial scope of the U.S. patent laws extends to U.S.-flagged ships in its motion to dismiss because the district court had already ruled in a related case filed against DAI (after DAI was dismissed from the present case) that the territorial scope of U.S. patent laws does extend to U.S.-flagged ships.  *See M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc.*, 99 F. Supp.3d 969 (D. Minn. 2015).

14

### 3.    The Court's Dismissal for Lack of Personal Jurisdiction

On March 1, 2016, the district court granted DAL's motion to dismiss. (Appx25-26.)  In doing so, the court applied this Court's three-part test for assessing specific jurisdiction:  (1) whether the defendant purposefully directed its activities at residents of the forum, (2) whether the claim arises out of or relates to the defendant's activities with the forum, and (3) whether assertion of personal jurisdiction is reasonable and fair.  (Appx18.)  The court considered that M-I bears the burden on the first two parts of this inquiry, and if satisfied, "the burden shifts to the defendant to prove that personal jurisdiction is unreasonable."  (*Id.*)

Applying this legal framework, the court first concluded that DAL had not purposefully availed itself of the privilege of conducting activities within the United States.  (Appx22.)  The Court based this conclusion of a variety of facts, including:

- "Petrobras, not DAL, had exclusive control over where the accused systems were installed."

- "The contract required DAL to install and operate pneumatic conveying systems on Petrobras oil rigs and the ships supporting those rigs in the Exclusive Economic Zone of Brazil."

- "Vessel installation under the contract terms was only a possibility—a possibility exclusively under Petrobras' direction."

- "The contract did not explicitly identify the ships on which DAL would be require to make installations, much less the flags under which these ships were operated."

15

(Appx19.)  The Court concluded that "DAL's contacts with the HOS Pinnacle and HOS Resolution was therefore due to the unilateral activity of another party and random insofar as it was completely dependent on Petrobras' direction."  (*Id.*)

M-I's primary argument for jurisdiction at the district court was that DAL knew it might be required to install equipment on U.S.-flagged ships because a DAL employee, Marcelo Osorio, previously worked for M-I when M-I installed equipment on U.S.-flagged ships for Petrobras.  (Appx1456-58.)  The court rejected that argument, finding that even if Osorio's knowledge could legally be imputed to DAL—an issue it did not resolve—"this knowledge is not indicative of what would be required by Petrobras under the DAL contract."  (Appx22.)  "At most, Osorio's knowledge establishes that there was a possibility Petrobras might require DAL to install equipment on a U.S.-flagged ship.  Purposeful availment, however, requires more than a mere possibility."  (*Id.*)

Turning to the fair and reasonable inquiry, the court analyzed the five factors identified in *Burger King Corp. v. Rudzewicz*, 471 U.S. at 462, 477 (1985).  (Appx. 22-25.)  Finding that four of the factors favored DAL (two of them "heavily" so) and that the remaining factor was neutral, the court concluded that the exercise of jurisdiction over DAL would be "neither reasonable nor fair."  (*Id.*)  For these collective reasons, the Court dismissed the case.

16

# SUMMARY OF THE ARGUMENT

## Issue 1

The alleged infringement in this case involves a Brazilian company (DAL) providing services to a Brazilian oil company (Petrobras) in support of the exploration of Brazilian oil from Brazilian oil rigs in Brazilian jurisdictional waters pursuant to a contract entered into in Brazil. All relevant activity occurred in the mainland of Brazil or the waters off the coast of Brazil over which Brazil exercises jurisdictional control.

M-I's brief is overrun with references to allegedly infringing activity occurring "on U.S. territory." M-I's brief only belatedly acknowledges that M-I is not actually talking about the United States, its physical territories, or even the territorial waters of the United States. Instead, M-I relies solely on activities DAL performed on ships operating off the coast of Brazil that happened to be flying U.S. flags.

Even assuming that a U.S.-flagged ship is United States "territory" for the purpose of U.S. patent law, DAL's alleged infringement on two U.S.-flagged ships located off the coast of Brazil is insufficient to find personal jurisdiction over DAL. DAL did not seek to do business on board U.S.-flagged ships. DAL's activities on the U.S.-flagged ships were the result of the unilateral and fortuitous decision of Petrobras to lease U.S.-flagged supply ships to support its oil

exploration in Brazilian jurisdictional waters. DAL did not purposefully avail itself of the United States market when it did not breach its contract with Petrobras in response to Petrobras' unilateral decision.

Moreover, DAL neither commercially exploited the United States, nor received any benefits or privileges of doing business in the United States, by performing services on the U.S.-flagged ships. DAL served only Petrobras and the Brazilian market. DAL did not provide services for the supply ships themselves, the owners of those ships, or the ships' crews. The flag of the ships was completely incidental to DAL's performance of services in Brazilian jurisdictional waters pursuant to a Brazilian contract for the benefit of a Brazilian company.

Finally, exercising personal jurisdiction over DAL would not comport with the "fair play and substantial justice" prong of the jurisdictional inquiry. Litigating this dispute in the U.S. would be very burdensome on DAL, particularly in view of the tangential and fortuitous relationship the accused activities have with the U.S. In contrast, M-I does not have a legitimate interest in pursuing this duplicative litigation when it has already filed suit in Brazil for the exact same accused activities. The fact that the underlying activity all occurred within Brazil or its jurisdictional waters raises issue of comity that further favor dismissal. The district court properly granted DAL's motion to dismiss.

## Issue 2

The dismissal for lack of personal jurisdiction was also proper because a U.S.-flagged ship is not a "territory" of the United States for the purpose of U.S. patent laws.  The Supreme Court has held that the idea that a U.S.-flagged ship is "part of the territory of the country whose flag she flies" is a figure of speech, a *metaphor,* that is not literally true. The territorial extent of the U.S. patent laws is statutorily defined in 35 U.S.C. § 100(c).  When interpreting the term "territory" in other U.S. statutes, the Supreme Court and other courts have consistently rejected the notion that U.S.-flagged ships are "territory."  There is no reason for the Patent Act to be an exception.  To the contrary, extraterritoriality concerns require that the territorial scope of the patent laws be strictly and narrowly construed.  There is no clear evidence that Congress intended the Patent Act to apply aboard U.S.-flagged ships, and this Court should not infer such intent based on a metaphor.

## STANDARD OF REVIEW

M-I's statement of the standard of review omits two relevant points.  One, while *uncontested* allegations in a complaint must be accepted as true, if a defendant offers evidence regarding an allegation in the complaint, the plaintiff must offer affirmative evidence contesting the defendant's evidence. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017-18 (Fed. Cir. 2009); *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072-73 (8th Cir. 2004). Two, in determining whether a plaintiff has made out a *prima facie* case of personal jurisdiction, the court must consider, not just the plaintiff's evidence, but also all evidence submitted by the defendant that is not genuinely disputed.  *See Autogenomics*, 566 F.3d at 1014-16, 1021.

## ARGUMENT

**I.    Even Assuming That a U.S.-Flagged Ship is a United States "Territory" Under the Patent Act, The District Court Correctly Dismissed for Lack of Personal Jurisdiction**

### A.    Legal Standard

The jurisdictional inquiry in this case boils down to whether the assertion of jurisdiction over the defendant would comport with due process.  Due process requires that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)

(citation and internal quotation marks omitted).  Federal Circuit law governs the

determination of personal jurisdiction in patent infringement cases.  *Red Wing*

*Shoe Co., Inc. v. Hockerson-Halbertstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir.

1998).

    To support jurisdiction, M-I relies on Federal Rule of Civil Procedure

4(k)(2).  The "minimum contacts" inquiry under Rule 4(k)(2) is the same as the

traditional jurisdiction inquiry, except that it "contemplates a defendant's contacts

with the entire United States, as opposed to the state in which the district court

sits."  *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d

1285, 1295 (Fed. Cir. 2009).

    On appeal, M-I asserts only specific jurisdiction over DAL.  To assess

specific jurisdiction, this Court uses a three-prong test that inquires as to whether

(1) the defendant purposefully directed its activities at residents of the forum state,

(2) the claim arises out of or relates to the defendant's activities with the forum

state, and (3) assertion of personal jurisdiction is reasonable and fair.  *Grober v.*

*Mako Prods., Inc.*, 686 F.3d 1335, 1346 (Fed. Cir. 2012).  The statement is often

made that "[t]he plaintiff has the burden of proving parts one and two of the test,

and then the burden shifts to the defendant to prove that personal jurisdiction is

unreasonable."  *Id.* (citations omitted.)   Ultimately, however, a court must balance

the strength of the evidence regarding the defendant's purposeful contacts with the

forum with the evidence regarding the reasonableness to determine whether the assertion of jurisdiction comports with due process.  *See Burger King*, 471 U.S. at 477.

### B.    M-I Failed to Show that DAL Purposefully Directed Allegedly Infringing Activities at Residents of the United States

### 1.    This Suit Concerns Purely Brazilian Business Activities

This case exclusively involves Brazilian commerce.  M-I filed this suit because one Brazilian company, M-I Brazil, lost a contract to another Brazilian company, DAL.  The contract was negotiated and signed in Brazil.  (Appx780.) The contract relates to the harvesting of Brazilian natural resources, and was the result of an RFP process conduced in Brazil by Petrobras, a company that is partially owned by the Country of Brazil.  (*Id.*)

The contract confirms the Brazilian nature of the transaction.  The contract contemplated all activities being performed in Brazil, its ports, and the waters that Brazil exercises jurisdictional control over pursuant to international treaty. (Appx976-77.)  It expressly required DAL to comply with a plethora of Brazilian laws and regulations.  (Appx975, 978, 981, 984-85, 1015, 1018-19, 1023.)  It specified payment in Brazilian currency.  (Appx995.)  It contemplated the payment of taxes in Brazil.  (Appx1013-14.)  It identified bases and ports where various activities may be performed, all of which are in Brazil.  (Appx976-77.)  It included a choice of forum provision identifying Rio de Janeiro, Brazil.  (Appx1031.)

All of DAL's services under the contract were performed by Brazilian employees residing in Brazil.  (Appx782.)  DAL designed and fabricated the equipment at issue in Brazil.  (Appx781-82.)  The equipment was designed and certified to Brazilian—not U.S.—standards for pressure vessels, and so could not be marketed in the U.S.  (Appx782.)   The equipment was installed in Brazilian ports.  (Appx781.)

Simply stated, nothing about this transaction involved U.S. commerce.  No payments under this contract were made to or from anyone in the United States.  M-I Brazil, not M-I LLC or some other U.S. M-I entity, bid on the contract.  The sole beneficiary of the services performed under the contract was Petrobras.  Not one person from the United States derived any benefit from the services provided by DAL under the contract.   Not one person set foot on U.S. soil in performance of the contract.

### 2.     DAL's Activities Aboard U.S.-Flagged Ships Are Insufficient to Find Personal Jurisdiction

For personal jurisdiction to be found, it is "essential" that there be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added).  "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts,

or of the '*unilateral activity of another party or a third person*.'"  *Burger King Corp.*, 471 U.S. at 475 (citations omitted) (emphasis added).  In other words, personal jurisdiction is proper only "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State."  *Id.*

DAL's only alleged contacts with the United States are metaphysical—activities performed on two U.S.-flagged ships.  Without input or guidance from DAL, Petrobras leased these ships, among others, to serve its Brazilian oil rigs.  (Appx780-81.)  During the time period at issue these ships did not leave the jurisdictional waters of Brazil.  (Appx782.)  DAL's contacts with these ships—performed solely for the benefit of a Brazilian company—do not support the exercise of jurisdiction.  Instead, these contacts are the type of "random," "fortuitous," and "attenuated" contacts resulting from the "unilateral activity of another party" that the Supreme Court has held cannot be relied upon to establish jurisdiction.  *Burger King Corp.*, 471 U.S. at 475.

### a.    DAL's Activities on the U.S.-Flagged Ships Were the Result of the Unilateral Actions of a Third Party

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."  *Hanson*, 357 U.S. at 253.  Here, it was Petrobras that unilaterally selected two U.S.-flagged ships and instructed DAL that it would need to install its

equipment on those ships.  (Appx780-81.)  DAL had no influence or control over the selection of the vessels.  (*Id.*)  Accordingly, these contacts do not support jurisdiction.  *Hanson*, 357 U.S. at 253; *see also Kulko v. Superior Court of Cal.*, 436 U.S. 84, 93-94 (1978) (father who for years sent his daughter to live in California and sent child support payments to California held not subject to suit in California because the contacts were the result of the mother's unilateral decision to live in California); *Xtera Communs. Inc. v. TPACK A/S*, No. 2:09-263, 2010 U.S. Dist. LEXIS 110349, at *5-7 (E.D. Tex. Sep. 1, 2010) (defendant who demanded payment from a Texas corporation held not subject to suit there because defendant had contracted with a Canadian corporation that was subsequently acquired by the Texas corporation) *adopted by* No. 2:09-263, 2010 U.S. Dist. LEXIS 110321.

DAL had no reason to anticipate that its performance under the Petrobras contract would result in being forced to submit to U.S. jurisdiction.  The transaction was purely Brazilian.  The RFP, negotiation, and execution of the contract were conducted in Brazil by two Brazilian companies involved with exploration for Brazilian oil on Brazilian oil rigs.  (Appx780.)  The contract contemplated all activities being performed in Brazil and the jurisdictional waters of Brazil.  (Appx977, 1023.)

At the time DAL executed its contract with Petrobras, it was undermined whether DAL would be operating any equipment on any ships, much less what the flags of those ship(s) might be. (Appx780-81, 986.) Petrobras's decision to lease U.S.-flagged supply ships (in addition to supply ships from other countries) to support its Brazilian oil rigs was not communicated to DAL until after the contract was executed. (Appx780-81.) By the time DAL learned about services being performed on U.S. ships, it was contractually bound to comply. Breaching a contract to avoid those contacts would have disrupted massive and costly oil exploration efforts involving the coordinated activities of many companies. It would be unreasonable to subject a Brazilian company like DAL to jurisdiction half a world away because it did not breach its Brazilian contract with Petrobras.

*Bellisio Foods, Inc. v. Prodo Pak Corp.*, No. 07-4520, 2008 U.S. Dist. LEXIS 90051 (D. Minn. Nov. 4, 2008) is on point. *Bellisio* held that the defendant's post-contract contacts with the forum resulting from the unilateral conduct of the other party to the contract was not purposeful and did not support jurisdiction. 2008 U.S. Dist. LEXIS 90051 at *22. As the *Bellisio* Court explained, "By the time [the defendant] learned . . . that the machine was destined for [Minnesota, the forum state] he could not freely choose whether to deliver the machine to a carrier for shipment to Minnesota." *Id*. at *26. The defendant could

have avoided contacts with Minnesota "only by breaching its contract" and so was effectively "trapped into doing business" with a resident of the forum. *Id.*

Here, the district court correctly applied *Bellisio* to the facts of this case. As *Bellisio* noted, "the very function of the purposeful-availment inquiry is to ensure that defendants are able to freely decide whether to engage in actions that might subject them to jurisdiction in a foreign forum." *Id.* at *25. DAL did not freely decide to do business in the United States; rather, it was compelled to install and operate equipment on two U.S.-flagged ships by the unilateral actions of Petrobras. Because DAL's activities on the U.S.-flagged ships were not "purposeful," they do not support the exercise of personal jurisdiction.

M-I wrongly argues that *Bellisio* is inapposite because the defendant "expected to perform in New Jersey." (M-I Br. at 41, n. 6.) The *Bellisio* court stated that "[t]he record is not clear whether [the defendant] expected to have that machine delivered to the New Jersey plant or instead directly to Bellisio." *Bellisio*, 2008 U.S. Dist. LEXIS 90051, at *25. Instead, the Court explained that "nothing in the record suggests that, at the time [the defendant] entered into the contract with [the plaintiff], he had reason to believe that the machine would be delivered to [the forum state]." *Id.* That is the same situation here: DAL had no reason to expect its performance under the Petrobras contract would result in contacts with U.S.-flagged ships.

27

M-I also continues to argue that jurisdiction was proper because DAL recognized when it entered into the contract with Petrobras that it might be required to operate equipment aboard U.S.-flagged ships.  (M-I Br. at 34-35, n.5.) In doing so, M-I misstates the district court's ruling in order to more easily attack it.  The district court did not, as M-I claims (*id.* at 34), hold that a party can avoid jurisdiction as long as it does "not know for certain" that its activities would take place in the forum.  Rather, the district court correctly held that purposeful availment "requires more than a mere possibility" of contacts with the forum. (Appx22 (citing *World-Wide Volkswagen*, 444 U.S. at 297).)  The mere possibility that Petrobras would require DAL to perform services on one or more U.S.-flagged vessels was insufficient to show purposeful action directed towards the forum and does not support jurisdiction.[3]

---

[3]  M-I points out that, due to his prior employment with M-I, DAL employee Marcelo Osorio was aware that Petrobras has previously used U.S.-flagged supply ships to service its Brazilian oil rigs.  (M-I Br. at 34-35, n.5.)  But Mr. Osorio was also aware from his time at M-I that Petrobras had used ships from Brazil, Liberia, the United Kingdom, and Vanuatu.  (Appx1196.)  Simply because Petrobras used U.S.-flagged ships in the past did not mean it would do so again.  For example, Osorio was aware that Petrobras had previously used Liberian-flagged ships, and yet DAL was not directed to perform any services on Liberian-flagged ships. (*Id.*) Conversely, Osorio had no prior experience with Petrobras using Norwegian-flagged ships, and yet DAL was directed by Petrobras to perform services on a Norwegian-flagged ship.  (*Id.*)  Thus, even assuming Osorio's knowledge gained during his employment with M-I can be imputed to DAL, the district court correctly held that it does not show anything more than a mere *possibility* that Petrobras might employ U.S.-flagged ships.  (Appx22.)

**b.    DAL Neither Commercially Exploited the U.S. Ships Nor Received Any Benefits or Privileges From Doing Business in the U.S.**

In its brief, M-I argues that jurisdiction lies because DAL employees purposefully operated the allegedly infringing equipment on the U.S.-flagged ships "for years," even after it was notified of M-I's contention that doing so violated M-I's U.S. patent rights.[4]  (M-I Br. at 3, 17, 28, 33-34.)  "Purposeful availment," however, requires more than the purposeful performance of an act; it requires the defendant to have purposefully availed itself of the privilege of conducting activities in the forum, thus invoking the benefits and protections of its laws. *Hanson*, 357 U.S. at 253.  In the commercial context, purposeful availment looks to whether the defendant engaged in "efforts . . . to serve, directly or indirectly, the market for [a] product" in the forum.  *World-Wide Volkswagen*, 444 U.S. at 295, 297; *see also Asahi Metal Indus. Co., v. Superior Ct. Cal.*, 480 U.S. 102, 111 (1987).

In the present case, DAL derived no economic or other benefit from the United States during the entire period that it performed under the Petrobras contract.  DAL never sought to serve the U.S. or its citizens or to commercially exploit the U.S. market.  It was of no moment to DAL that two of the ships

---

[4] M-I greatly overstates the extent of DAL's alleged infringement.  Drilling operations are irregular and discontinuous, and there are no allegations or evidence concerning the extent to which the equipment on the U.S.-flagged ships was actually used.

happened to be flying U.S. flags. (Appx1196.) The flags of the ships were completely incidental to DAL's performance of services in Brazilian jurisdictional waters pursuant to a Brazilian contract for the benefit of a Brazilian company.

DAL did not serve or exploit even the U.S.-flagged ships themselves. DAL had no contract with Hornbeck, the operator of those supply ships. (Appx780-81.) DAL did not provide services to benefit Hornbeck, the ships or the ships' crews.

Like the defendants in *World-Wide Volkswagen* and *Asahi*:

- DAL never advertised its services or solicited business in the United States or on the U.S.-flagged ships;

- DAL never sold equipment or services to anyone in the United States or to anyone on the U.S.-flagged ships;

- DAL had no financial dealings with anyone in the United States, or with the U.S.-flagged ships or their crew;

- DAL did not design its equipment for the U.S. market; it was designed to comply with Brazilian standards; and

- DAL does not have agents, employees, or property in the United States

(Appx779-82); *World-Wide Volkswagen*, 444 U.S. at 295; *Asahi*, 480 U.S. at 112-113. As the Supreme Court found in those cases, DAL did nothing in this case to invoke the benefits and protections of law of the U.S., and the exercise of jurisdiction over DAL would exceed the limits of due process.

Even the U.S.-flagged ships themselves were not being operated for the purpose of serving or exploiting the U.S. market. Hornbeck, brought the ships to

Brazil to support a Brazilian oil rig in furtherance of Hornbeck's contract with

Petrobras.  (Appx138, 249, 781-82.)  The supply ships were intimately connected

with a limited number of Brazilian oil rigs.  (Appx138, 781-82.)  Petrobras leased

those ships to transport its vendor's equipment, employees, and material between

the Brazilian mainland and Petrobras's Brazilian oil rigs.  (Appx781-82.)

    M-I argues that the district court's ruling creates a "blueprint" for

defendants to "evade" jurisdiction and "get out of jail free" "simply by pointing to

a customer contract or request and saying, 'They made me do it.'" (*See* M-I Br. at

4, 14-16, 34, 42.)  If there were evidence that DAL sought to exploit the U.S.

market while relying on the Petrobras contract to avoid U.S. jurisdiction, that

argument might be relevant here.  But there is no such evidence.  DAL never

sought to exploit the U.S.-flagged ships, much less the U.S. market.  This was true

at the time DAL entered into the contract with Petrobras and it was true throughout

DAL's performance under the Petrobras contract.  DAL sought to exploit the

Brazilian market by entering into a contract with a Brazilian company to perform

services in Brazil and Brazilian jurisdictional waters.  The fact that DAL was

required to perform some of those services on U.S.-flagged ships was entirely

tangential to the activity at issue.

    M-I's "get out of jail free" argument also ignores M-I's lawsuit in Brazil for

infringement of M-I's counterpart Brazilian patent.  DAL does not contest personal

31

jurisdiction in Brazil. The district court's dismissal of M-I's U.S. lawsuit for lack of personal jurisdiction over DAL does not leave M-I without a remedy.

### c. M-I's Cases Support DAL's Position, Not M-I's

M-I identifies four cases that it claims show that "U.S. courts have repeatedly rejected" DAL's purposeful availment argument. (M-I Br. at 37.) If anything, these four cases support DAL's position because they show the sort of "purposeful availment" required to create personal jurisdiction that is lacking here.

Three of the cases involve defendants who commercially exploited the forum by engaging an established distribution channel that the defendants knew served the forum. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994) (the defendant "intentionally established" an ongoing relationship with a distribution channel that served the forum and then "purposefully shipped" the accused retail product into the forum through that established distribution channel); *Kraft Foods Group Brands LLC v. TC Heartland, LLC*, 2015 U.S. Dist. LEXIS 106515, at *3, *writ of mandamus denied*, *In re TC Heartland LLC*, 821 F.3d 1338 (Fed. Cir. 2016) (the defendant sold products to two different national account distributors, and directly shipped its product into the forum to customers); *Worldtronics Int'l, Inc. v. Ever Splendor Enterprise Co.*, 969 F. Supp. 1136, 1138-39 (N.D. Ill. 1997) (the defendant sold its products to distributors with distribution channels it knew led to national U.S.

retailers and sent samples directly to U.S retailers).  The use of an established distribution channel "is a significant factor" in these stream-of-commerce cases because it means the defendant has purposefully availed itself of the forum.  *See Beverly Hills*, 21 F.3d at 1565-66.

As discussed above, DAL never did anything to commercially exploit the U.S.-flagged ships, much less the United States itself.  DAL never used any distribution channel to sell services to anyone in the U.S.  The present case involves a single contract for services to be provided in Brazil and/or Brazilian jurisdictional waters to a Brazilian company that unexpectedly resulted in the defendant having tangential contacts with two U.S.-flagged ships due to the unilateral activity of its customer.  M-I's stream of commerce cases have no application here.

The fourth case relied on by M-I is *Intercon Inc. v. Bell Atlantic Internet Solutions, Inc.*, 205 F.3d 1244, 1247-48 (10th Cir. 2000).  It is not a patent case.  In *Intercon*, the plaintiff operated an email server in Oklahoma, and the defendant improperly co-opted that server to route its email traffic.  *Intercon*, 205 F.3d at 1246.  While the defendant originally began doing so by accident, it continued to use the plaintiff's Oklahoma server for months after being notified of the error.  *Id.* The court held that the defendant's decision to continue use of the Oklahoma server was purposeful and rendered it subject to suit in Oklahoma.  *Id.* at 1248.

33

Unlike the present case, the defendant's ongoing use of the Oklahoma server in *Intercon* was not the unexpected result of a contract entered into by the defendant. The defendant was free to discontinue using the Oklahoma server at any time but intentionally chose to continue using it to serve the defendant's own business needs. *Id.* at 1248. By doing so, the defendant commercially exploited the servers located in Oklahoma at the direct expense of the plaintiff there. In contrast, in the present case, DAL's ongoing presence on the U.S.-flagged ships was the result of the unilateral decision by Petrobras and DAL's obligation to perform under the Petrobras contract. And in performing under the Petrobras contract, DAL did not commercially exploit the U.S.-flagged supply ships, much less the United States itself. *See supra*, pp. 29-30.

### d.    U.S.-Flagged Ships Are Not the Same the United States for Jurisdictional Purposes

As discussed in Section II below, the notion that a ship is "the territory of the flag which she flies" is a metaphor that does not apply to the U.S. patent laws. But even if this Court were to hold otherwise, ships nonetheless differ from U.S. soil in ways that are important to the personal jurisdiction analysis.

The boundaries of the United States and its physical territories (e.g., Guam and Puerto Rico) are fixed. Those boundaries can be found at any time on any map. When persons enter the United States or its physical territories, they

unquestionably know and intend to enter the U.S. They go through customs. They need to show a passport.

Ships are different. Ships are mobile. While a ship may be U.S. registered and bear a U.S. flag, that does not mean that the ship operates anywhere near the United States. Ships travel from country to country. Sometimes (as here), a ship of one country can spend years operating within the jurisdiction of another country and serving the interests of that foreign country. A person boarding a ship typically is not required to go through customs or show a passport. Persons boarding a ship generally do not pay attention to the flag and do not consider that they are entering the country of that flag simply by boarding the ship.

These differences are directly relevant to the personal jurisdiction analysis. Because ships are mobile, persons can board them from any coastal country in the world and never leave the jurisdiction of that country. That cannot occur when a person steps on the soil of the United States or its physical territories. A person cannot be on U.S. land and still be in the territorial jurisdiction of Brazil. A Japanese citizen who boards a U.S.-flagged ferry located off the coast of Japan would not reasonably anticipate being dragged around the world into a U.S. court for using an allegedly infringing phone on the ferry.

M-I's treatment of ships as "territory" for personal jurisdiction purposes simply goes too far. In the present case, Petrobras directed DAL to perform

services, not just on U.S.-flagged ships, but also on U.K. and Norwegian-flagged ships. (Appx1196.) Petrobras just as easily could have directed DAL to perform its services on ships flagged from Mexico, Liberia, or any other country in the world. (*See id.*; Appx1462.) If M-I's argument were accepted, then M-I could file separate suits against DAL in each and every one of those countries, and DAL would be subject to suit in each of those countries. Such an outcome ignores the "purposeful availment" requirement and violates due process. None of the specific contacts alleged by M-I occurred in the United States or its physical territories. A Brazilian company such as DAL would not reasonably anticipate being haled into court in the United States for operating allegedly infringing equipment in Brazilian jurisdictional waters simply because it did so on two U.S.-flagged ships.

For all of the foregoing reasons, the district court correctly found that DAL did not purposefully direct its activities at residents of the United States. Because M-I failed to establish the first prong of the specific jurisdiction test, the district court correctly dismissed the case. *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1380 (Fed. Cir. 2015).

## C.    The District Court Correctly Found that It Would Be Unreasonable to Subject DAL to Jurisdiction in this Case

Even if this Court were to conclude that DAL has minimum purposeful contacts with the U.S., the due process clause still prohibits the exercise of jurisdiction unless it would comport with principles of "fair play and substantial

36

justice." *Burger King*, 471 U.S. at 476.  M-I correctly recites the non-exhaustive list of five factors considered when assessing the reasonableness of asserting jurisdiction (M-I Br. at 43), but its analysis of those five factors is fundamentally flawed.  A correct application of these factors shows that personal jurisdiction over DAL would be unreasonable, especially when those factors are balanced with a weak showing of contacts with the forum.

**1.    The Burden on DAL to Litigate in the United States Would Be Substantial**

The district court correctly concluded that the first factor—the burden on the defendant if it was forced to submit to jurisdiction in the United States—"weighs heavily in DAL's favor."  (Appx23.)  As recognized in *Asahi*, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness in stretching the long arm of personal jurisdiction over national borders."  *Asahi*, 480 U.S. at 114.  Where, as here, the question of jurisdiction is over a foreign defendant, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting).

M-I understates the burden that litigating this case in Minnesota would impose on DAL.  The burdens include: (1) the cost and inconvenience of travel for the parties and counsel between Brazil and the United States; (2) a language barrier

that will impede dialogue between English-speaking U.S. counsel and Portuguese-speaking Brazilian witnesses during depositions and witness interviews; (3) the need to engage in the complex process of obtaining third-party discovery of Brazilian entities such as M-I Brazil and Petrobras; (4) the need to translate countless documents written in Portuguese from DAL and third-parties such as M-I Brazil and Petrobras; (5) duplicative litigation in Brazil addressing the same underlying activities as those complained of in this case, along with the possibility of inconsistent rulings in those cases.

M-I dismisses these burdens based on dicta from *World-Wide Volkswagen* concerning improvements in the means of communication and transportation. (M-I Br. at 44.) Despite such improvements, *World-Wide Volkswagen* and other cases have still concluded that the burden of travel is substantial and supports the lack jurisdiction over a foreign defendant. *World-Wide Volkswagen*, 444 U.S. at 299; *see also Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488-89 (9th Cir. 1993). Moreover, improved means for travel and communication do not eliminate language barriers and the attendant burdens in conducting depositions, providing legal advice, and performing document review. Nor do these means eliminate the burden of duplicative litigation concerning the same activities proceeding in multiple countries, help Brazilians understand the very different legal processes of

the United States compared to Brazil, or secure discovery from third parties in foreign countries.

On pages 45-47 of its brief, M-I discusses a number of cases where a court held that U.S. litigation would not be overly burdensome to a foreign defendant. All of the cases, however, involved a strong showing by the plaintiff of efforts by the defendant to directly exploit the U.S. market. The defendants in those cases had effectively demonstrated the lack of burden on them to do business and litigate in the U.S. by their own conduct. Unlike the defendants in these cases, DAL has never marketed or sold any products in the U.S. or even on U.S.-flagged ships. And unlike in the *Westerngeco* case relied on by M-I (M-I Br. at 47), DAL does not share a management team with DAI and the two entities do not operate as a single, integrated company with the aligned purpose of marketing and selling products in the United States. (Appx779-83.) In fact, the evidence confirmed otherwise, and led the district court to reject M-I's alter ego argument. (Appx1330-31.) M-I does not challenge that ruling on appeal.

M-I also misleadingly characterizes the contacts that DAL has with the United States. M-I claims that DAL's minority owner "regularly" travels to the United States, without mentioning that "regularly" means only once per year. (Appx783, 856-57.) It is undisputed that those trips lacked any nexus to the accused activities. (*Id.*) As the district court correctly found, "an annual trip of

39

one employee to the United States does not equate to the burdens of defending a

complex patent infringement case." (Appx23.)  Similarly, M-I asserts that DAL

"sends revenue" to DAI.  In reality, DAL purchases pneumatic conveying

components from DAI that it uses to fabricate custom systems it sells in South

America.  (Appx783.)  The fact that DAL has a components supplier and

shareholder in the U.S. does not detract from the burden of litigating here.

Next, M-I Drilling suggests that DAL's retention of the same legal counsel

as DAI "significantly undercuts" the burden for DAL to litigate in the United

States.  (M-I Br. at 46-47.)  Neither M-I's brief nor the cases cited by M-I explain

why sharing counsel with a co-defendant has any substantial effect on burden.  At

most, sharing counsel might result in a slight decrease in the cost of defense, but

has no effect on the many other burdens discussed above.  And regardless, any

cost-savings to DAL by virtue of its retention of the same legal counsel as DAI are

gone.  M-I's original complaint against DAI was dismissed, and M-I has moved to

dismiss the second, separate lawsuit that it filed against DAI in Minnesota.  *See*

Plaintiffs Motion to Dismiss,  M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc.,

No. 14-4857 (D. Minn. May 6, 2016), ECF No. 211.

Finally, M-I argues there are means for reducing the burden on DAL, such

as permitting depositions in Brazil and accepting remote testimony.  (M-I Br. at

47-48.)  Such alternative means would have little effect on the many burdens

40

discussed above.  Moreover, it would place DAL in a vastly inferior position if it were to submit video testimony while M-I offers live testimony, rendering these "alternative means" illusory.

M-I's arguments fail to rebut DAL's showing that this litigation would impose a substantial burden on it.  The district court correctly found that this factor strongly favors DAL.

### 2.    The U.S. Has No Interest in Policing Brazilian Commerce

The second factor—the forum's interest in adjudicating the dispute—also favors DAL in this case.  The district court correctly found that "all of the economic activities related to this action occurred in Brazil and allegedly resulted in one Brazilian company (DAL) receiving a contract over another (M-I Brazil)." (Appx23-24.)  This case has no connection to the U.S. marketplace and the U.S. has limited, if any, interest in policing the activities at issue.

M-I points out that U.S. courts have an interest in enforcing U.S. patent laws, but M-I fails to acknowledge the tenuous connection of the alleged injury to the United States.  The alleged infringement occurred on two supply ships that remained in Brazil's jurisdictional waters throughout the relevant time period. (Appx504, 782.)  The M-I entity that submitted and lost the bid—M-I Brazil—is also Brazilian.  (Appx137-38.)  DAL never received money from the U.S.-flagged ships, much less the United States itself, as a result of its activities on those ships.

Consequently, the district court was correct to question whether there was any injury inflicted in the United States.[5]  (Appx23); *see Norvel Ltd. v. Ulstein Propeller AS*, 161 F. Supp. 2d 190, 207 (S.D.N.Y. 2001) ("The United States has an interest in protecting the business dealings of its residents. However, plaintiffs have failed to allege for Rule 12(b)(2) purposes that [defendant's] actions have had a substantial effect on United States commerce.").

Finally, M-I suggests that the court was wrong to consider the residence of M-I UK and wrong to ignore M-I LLC (its U.S. subsidiary) in its analysis.  As to the first alleged error, numerous courts have held that the U.S. has a *reduced* interest in matters involving only foreign plaintiffs.  *Asahi*, 480 U.S. at 114 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished."); *Metro. Life*, 84 F.3d at 574; *Norvel*, 161 F. Supp.2d at 207.  As for M-I LLC, its interest in the patents is nothing more than a belated, litigation-induced attempt to manufacture a connection to the forum.  M-I LLC was not granted any rights under the patents in suit until years after the present lawsuit was filed, and *after* the allegedly infringing equipment had been removed from the U.S.-flagged ships.  (Appx782.)  M-I only sought to amend

---

[5] M-I misinterprets the district court's reference to the "extent" of injury suffered in the United States.  (M-I Br. at 49-50.)  The language chosen by the court, as well as the context provided by the subsequent sentences, confirms that it was not referring to the amount of injury, but rather to the geographic location of the injury.

the complaint to add M-I LLC after DAL filed its motion to dismiss, and M-I

represented to the Court that the amendment did not impact the motion to dismiss.

(Appx1205-06; *see also* Appx16.)

This factor also weighs against the exercise of jurisdiction in this case.

### 3.     M-I Lacks Any Relevant Interest in Obtaining Convenient and Effective Relief in The U.S.

For largely the same reasons that the U.S. lacks any interest in policing

Brazilian commerce, M-I lacks any cognizable interest in obtaining relief in the

United States.  The only connection that this case has to the United States is that

Petrobras chose to use two U.S.-flagged ships.  Under no circumstances was M-I

going to make money in the U.S, and the activities at issue had no impact on U.S.

commerce.  As M-I was not injured in the U.S., it has no legitimate interest in

obtaining relief here.  *See Westerngeco L.L.C. v. Ion Geophysical Corp.*, 791 F.3d

1340, 1350-51 (Fed. Cir. 2015) (denying plaintiff's claim for lost profits resulting

from failure to win a foreign services contract, stating that U.S. patent laws "do not

. . . provide compensation for a defendant's foreign exploitation of a patented

invention"), *vacated on other grounds* 2016 U.S. LEXIS 3943 (U.S. June 20,

2016).

M-I argues that it has a strong interest in enforcing its U.S. patents in the

U.S. because they cannot be enforced elsewhere.  M-I is wrong for two reasons.

First, courts in foreign countries *have* applied U.S. patent law. *See Voda v. Cordis Corp.*, 476 F.3d 887, 917 (Fed. Cir. 2006) (Newman, dissenting) ("Courts in other countries have not refrained from applying foreign patent law, including United States law. A Japanese court recently applied the United States doctrine of equivalents in a suit between Japanese companies that included questions of infringement of United States patents."). The cases M-I cites are instances where *U.S. courts* have declined to exercise supplemental jurisdiction over claims involving foreign patents. Even those cases have not held that a U.S. court could *never* hear a claim for infringement of a foreign patent. Rather, the courts in those cases merely declined supplemental jurisdiction because the foreign claims were not based on a "common nucleus of operative facts" as the U.S. claims. *Mars Inc. v. Kabushiki Kaisha Nippon Conlux*, 24 F.3d 1368, 1374-75 (Fed. Cir. 1994); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 598, 630-631 (N.D. Iowa 2006); *see also Voda.*, 476 F.3d. at 895 ("*Mars* did not establish a per se rule preventing U.S. courts from asserting supplemental jurisdiction to adjudicate foreign patents.") These U.S. cases do not support M-I's conclusion that Brazilian courts cannot hear claims involving U.S. patents. *See also ElcomSoft Ltd. v. Passcovery Co.*, No. 2:13-18, 2013 U.S. Dist. LEXIS 180407, at *9-10 (E.D. Va. Dec. 19, 2013) ("The fact that American courts may hesitate to enforce foreign

patents fails to establish that the Russian courts have a similar policy regarding American patents.")

Second, M-I's claim for infringement of its U.S. patents is wholly duplicative of its earlier-filed complaint for infringement of its Brazilian patents. M-I admits that the activities and patents at issue in the U.S. and Brazilian litigations are the same. (*See* M-I Br. at 52-53 (distinguishing *Mars*).) The Brazilian complaint expressly references the U.S.-flagged HOS Pinnacle and HOS Resolution. (Appx569-70, 596.) Thus, this is not a case where the plaintiff needs to file suit in multiple fora in order to fully capture all allegedly infringing activity; here, M-I is seeking relief in two fora *for the exact same allegedly infringing acts*. M-I does not have a legitimate interest in such duplicative relief. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) ("Respondent holds foreign patents; it does not adequately explain why it does not avail itself of them.") The third factor also supports the district court's dismissal.

### 4.    This Dispute Could Be Most Efficiently Resolved in Brazil

The fourth factor—the judicial system's interest in obtaining the most efficient resolution of controversies—also strongly favors dismissal.

In arguing this factor, M-I completely ignores the two primary reasons why this case would be more efficiently tried in Brazil. First, nearly all of the evidence relevant to this dispute is in Brazil, where all of the accused activities occurred.

45

The relevant documents are in Brazil and are in Portuguese.  (Appx433-98, 565-08, 1046, 1054-69, 1099-1102, 1197, 1464-66.)  The relevant witnesses are in Brazil.  (Appx1197, 1464-66, 1602-05.)  The allegedly infringing equipment is in Brazil and on Brazilian oil rigs off its coast.  (Appx781-82, 1233.)  To the extent any evidence is not in Brazil, it is in the United Kingdom—the home of the patent owner and the inventor—not the United States.  (Appx33.)

Second, there is already another case pending in Brazil.  (Appx565-708.)  That court will already be required to hear and weigh the evidence concerning the identical activities and equipment at issue here.  Accordingly, this controversy can be most efficiently resolved by allowing the Brazilian court to finish the job it has already started.  *See e.g. TH Agric. Nutrition LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1296 (10th Cir. 2007) (finding Kansas an inefficient place to litigate where many of the relevant witnesses are in the Netherlands and litigating in Kansas would create piecemeal litigation); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 617 (5th Cir. 2008).

M-I argues that it would be less efficient to litigate this case in Brazil because it would force a Brazilian court to assess U.S. patent law.  As discussed in the previous section, however, M-I does not have a legitimate interest in pursuing duplicative litigation in two fora for the exact same allegedly infringing activity.

46

The district court correctly found that "judicial efficiency weighs heavily in favor of DAL." (Appx24.)

### 5.    This Case Directly Impacts the Country of Brazil and Brazilian Commerce

The final factor—the shared interest of the states in furthering fundamental substantive social policies—also supports dismissal. The district court correctly recognized that "Brazil's interests are implicated in this action" because (1) "the outcome of this case" will directly affect Brazil by virtue of its partial ownership of Petrobras, and (2) the case involves activities that occurred in "waters where Brazil has control over economic activities." (Appx25); *see also Asahi*, 480 U.S. at 115 (explaining that when foreign defendants are involved the court must consider "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction" by the forum state); *see also OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1098 (10th Cir. 1998) (identifying whether "the foreign nation's citizen chose to conduct business with a forum resident" and whether a foreign nation is a party to the suit as relevant considerations for the fifth factor of the reasonableness inquiry). Resolution of this case would require the U.S. to exercise jurisdiction over activities performed in the Exclusive Economic Zone ("EEZ") of Brazil. (Appx782.) The EEZ was created by UNCLOS, an international treaty that both the U.S. and Brazil recognize. United Nations Convention On the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S.

397.  Pursuant to this treaty, Brazil possesses "sovereign rights in economic exploitation of natural resources" in its EEZ.  *WesternGeco*, 776 F. Supp. 2d at 366.  Consequently, the exercise of jurisdiction over the activities at issue— services provided to a state-owned company in support of its exploitation of Brazil's natural resources—would impinge upon Brazil's sovereignty in this region.  Therefore, principles of comity and the U.S. interest in maintaining foreign relations with Brazil both support dismissal.  *TH Agric. Nutrition,* 488 F.3d at 1297 (declining to exercise jurisdiction because "exercising jurisdiction in Kansas would interfere with Dutch sovereignty"); *Wortham v. KarstadtQuelle AG*, 153 Fed. Appx. 819, 826 (3d Cir. 2005).

M-I does not mention, much less challenge, these considerations.  Instead, M-I once again argues that it is entitled to assert its U.S. patents and Brazilian courts cannot entertain claims based on U.S. patents.  As already discussed, neither of these propositions is correct.

### 6.     When Balanced With M-I's Weak Showing of Specific Contacts With the Forum, DAL's Showing on the Reasonableness Prong is More Than Sufficient to Support the District Court's Dismissal

M-I emphasizes the "high burden" that a defendant faces to show that the assertion of jurisdiction would not be fair and reasonable under the third prong of the specific jurisdiction analysis.  (E.g., M-I Br. at 42.)  While this Court has not yet addressed the issue, other circuits have unanimously held that that the court

must balance the reasonableness factors against the strength of the defendants' purposeful contacts with the forum. *Ticketmaster-N.Y. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994); *Metro. Life*, 84 F.3d at 568-69 (Second Circuit); *Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474, 479 (4th Cir. 1993); *Core-Vent*, 11 F.3d at 1488 (Ninth Circuit); *TH Agric. Nutrition*, 488 F.3d at 1287 (Tenth Circuit). This balancing analysis "evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need to show in terms of unreasonableness to defeat jurisdiction." *Ticketmaster*, 26 F.3d at 210. Such a sliding scale approach is supported by the Supreme Court's explanation that the defendant's contacts must be "considered in light of" the reasonableness factors. *Burger King*, 471 U.S. at 476.

Here, M-I's showing of purposeful contacts with the forum was weak at best. M-I's sole alleged specific contact with the United States are activities performed on a U.S.-flagged ship supporting a Brazilian oil rig in Brazilian jurisdictional waters for the benefit of, and at the direction of, a Brazilian customer. That is a slender reed to force a Brazilian company to litigate a patent in the U.S., particularly when M-I has already sued DAL for infringement based on the same activities on the same U.S. ships in Brazil. Given the weakness of M-I's contacts evidence, a lesser showing of unreasonableness would suffice to show that the assertion of jurisdiction would violate due process in this case. The district

49

court found that DAL had met its burden on the reasonableness prong without relying on such a balancing analysis. That a lesser showing was necessary here further confirms the correctness of the district court's dismissal.

## II. Dismissal Was Also Proper Because U.S. Patent Laws Do Not Extend to U.S.-Flagged Ships

M-I's entire premise for asserting personal jurisdiction is legally wrong. A U.S.-flagged ship is not a "territory" of the United States for the purposes of the U.S. patent laws. This provides yet a further reason for affirming the district court's dismissal.

### A. The Territorial Reach of the Patent Laws is Statutorily Limited to the United States, Its Territories and Possessions

The territorial reach of United States patent law is defined by statute. 35 U.S.C. § 154(a)(1) provides that every patent grants the patentee the right to exclude infringing acts "throughout the United States." And 35 U.S.C. § 271(a) states that it is an act of infringement to make, use, offer to sell, or sell a patented invention "within the United States," or import a patented invention "into the United States." Similar references to the United States can be found in subsections (c), (e), (f) and (g) of § 271.

The term "United States," in turn, is expressly defined to mean "the United States of America, its territories and possessions." 35 U.S.C. § 100(c). This definition was added as part of the 1952 Patent Act. *See Decca Ltd. v. United*

*States*, 544 F.2d 1070, 1073 (Ct. Cl. 1976), *rev'd on other grounds* 640 F.2d 1156 (Ct. Cl. 1980).  At the time the definition was added, the United States consisted of 48 states.  Alaska and Hawaii were considered "territories," while a variety of islands including Guam, Samoa and the U.S. Virgin Islands were considered to be "possessions."  *McCaw v. Fase*, 216 F.2d 700, 705 (9th Cir. 1954); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 388 (1948).

## B. Courts Interpreting the Statutory Term "Territory" Have Held It Does Not Extend to U.S.-Flagged Ships

M-I did not cite a single case to the district court, and DAL knows of none, where a court has interpreted a statute's recitation of "territory" to encompass a U.S.-flagged ship.  Instead, numerous cases have rejected this interpretation as based on a metaphor that is not literally true.

In *Cunard S.S. Co. v. Mellon*, 262 U.S. 100 (1923), the Supreme Court addressed the territorial scope of the Eighteenth Amendment to the Constitution and its enacting legislation.  The Eighteenth Amendment prohibited the manufacture, selling, importation, and exportation of intoxicating liquors into or from the "United States and all territory subject to the jurisdiction thereof."  *Id.* at 121.  The dispute related to whether steamship companies could legally serve, or even store, alcohol on passenger ships that travelled between the United States and foreign ports.

The Supreme Court started by analyzing the meaning and scope of the term "territory." *Id.* at 121-22. The Court concluded that "[t]he immediate context and the purport of the entire section show that the term is used in a physical and not a metaphorical sense." *Id.* The same is true for the use of "territory" in the Patent Act. The immediate context and purport of the patent act prohibits the same type of activities prohibited in the Eighteenth Amendment, i.e., providing that whoever "makes, uses, offers to sell or sells …within the United States," "imports … into the United States," or "causes to be supplied in or from the United States …," infringes the patent. 35 U.S.C. §§ 271(a) and (f)(1).

The Court then went on to reject the defendant's contention that a U.S.-flagged ship constitutes U.S. "territory," stating ***"[b]ut this, as has been aptly observed, is a figure of speech, a metaphor."*** *Id.* at 123 (emphasis added and citations omitted). That metaphor is "chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign." *Id.* The Court ultimately held that the Eighteenth Amendment and its enacting legislation applied inside U.S. territorial waters but did not apply when ships were outside of U.S. territorial waters, regardless of the ship's flag. *Id.* at 127-28.

Other cases have similarly rejected the "ship as territory" metaphor for the purpose of construing the term "territory" and other similar statutory language. *See United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929) (a U.S.-flagged ship is not a "territory or other place subject to the jurisdiction" of the United States as recited in the Immigration Act of 1917); *Scharrenberg v. Dollar S.S. Co.*, 245 U.S. 122, 127 (1917) (men employed on a U.S.-flagged ship were not laboring "in the United States" or performing labor "in this country" as recited in a U.S. statute); *Air Line Stewards & Stewardesses Assoc. v. Northwest Airlines, Inc.*, 267 F.2d 170, 175-77 (8th Cir. 1959) (persons employed on U.S.-flagged airplanes were not subject to statutes directed to transportation taking place "within the United States"); *Lam Mow v. Nagle*, 24 F.2d 316, 317-18 (9th Cir. 1928) (a person born on a U.S flagged ship was not born "in the United States" within the meaning of Article 14, Section 1 of the Constitution).

### C. Particularly Given the Presumption Against Extra-Territoriality, This Court Should Not Interpret "Territory" in § 100(c) to Extend to U.S.-Flagged Ships

Interpreting "territory" in § 100(c) to include U.S.-flagged ships would give substantial extraterritorial effect to the U.S. patent laws. Foreign nations have jurisdiction over ships entering their territorial waters. *Cunard*, 262 U.S. at 124 ("A merchant ship of one country voluntarily entering the territorial limits of another subjects herself to the jurisdiction of the latter."). Yet if a U.S.-flagged

ship qualifies as U.S. "territory" per se, then U.S. patent law would apply on that ship no matter where it is located—even floating on a river in the heart of a foreign sovereign nation. United States patents would also apply against the conduct and property of any person on board such a U.S.-flagged ship in foreign waters, including not just the domestic ship owner, but also foreign workers and contractors on the ship (like DAL), and even foreign passengers travelling on the ship in foreign waters.

There is a presumption against interpreting U.S. statutes to give them such extraterritorial effect. "It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Equal Empl. Opp. Comm. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). "We assume that Congress legislates against the backdrop of the presumption against extraterritoriality. Therefore, unless there is the affirmative intention of the Congress clearly expressed, we must presume it is primarily concerned with domestic conditions. " *Id.* (internal quotation marks and citations omitted). This canon of statutory construction "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.*

The presumption against extraterritoriality is recognized and applied in patent cases. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law.") *Deepsouth*, 406 U.S. at 531 (1972) ("Our patent system makes no claim to extraterritorial effect"); *Westerngeco*, 791 F.3d at 1349-50 (relying on the presumption to support the conclusion that damages cannot be obtained under 35 U.S.C. § 271(f) for lost profits resulting from lost contracts for services to be performed in international waters).

Congress did not "clearly express" an intent for "territory" in § 100(c) to cover U.S.-flagged ships. Certainly using the word "territory" cannot be said to constitute a clear expression that the patent act extends to U.S.-flagged ships, particularly when the Supreme Court had repeatedly held prior to the 1952 Patent Act that the common law "ship as territory" metaphor does not apply in the statutory construction context. *Cunard*, 262 U.S. at 123; *Claussen*, 279 U.S. at 401; *Scharrenberg*, 245 U.S. at 127.

Nor can such a clear expression of congressional intent be found in the legislative history of the patent laws. The 1952 Patent Act was not the first time that "territories" appeared in the patent statutes. The Patent Act of 1870 added the word "territories" to the description of the patent grant, stating that a patent granted

55

"the exclusive right to make, use, and vend the said invention or discovery throughout the United States and the Territories thereof."  Patent Act of 1870, ch. 230, § 22, 16 Stat. 198, 201 (repealed 1952). The legislative history of the 1870 Act, however, says nothing about this language being intended to cover U.S.-flagged ships.  H. JOURNAL, 41ST CONG. 2D SESS. (1869); S. JOURNAL, 41ST CONG. 2D SESS. (1869).   As for the legislative history of the 1952 Act, nothing in that legislative history evinces a Congressional intent, much less a clear one, to define "territory" to include U.S.-flagged ships.  The Senate Report merely states that the purpose of § 100(c) was "to avoid the repetitive use of long expressions through the statute."  S. REP. NO. 82-1979 (1952).

### D.    The Arguments Made by M-I in the District Court Are Unpersuasive

M-I made a number of arguments to the district court in both this case and the related case against DAI in support of its position that a U.S.-flagged ship is a "territory" of the United States under 35 U.S.C. § 100(c).  None of them are persuasive.

First, M-I argued that Congress has the authority to pass laws that govern what occurs on a U.S.-flagged ship, citing cases such as *McCulloch v. Sociedad Nacional De Marineros De Hond.*, 372 U.S. 10 (1963) and *Lauritzen v. Larsen*, 345 U.S. 571 (1953).  This argument misses the point.  The issue here is not whether Congress has the *authority* to extend the reach of the U.S. patent laws to

U.S.-flagged ships.  The issue is whether Congress did so in the 1952 Patent Act.

*See Aramco*, 499 U.S. at 248 ("Whether Congress has in fact exercised that authority [to enforce its laws beyond its territorial boundaries] is a matter of statutory construction.").  The fact that Congress made no reference to U.S.-flagged vessels in defining the territorial scope of the U.S. patent laws, but instead used words that are recognized as referring to physical lands and immediately surrounding waters, shows that Congress did not.

Second, M-I relied heavily on *Gardiner v. Howe*, 9 F. Cas. 1157 (C.C.D. Mass. 1865) (No. 5,219).  *Gardiner* is, of course, not controlling case law. *Gardiner* held that the U.S. patent laws applied to a U.S.-flagged ship located on the high seas.  9 F. Cas. at 1157.  However, *Gardiner* was decided under the Patent Act of 1836 which did not contain any statutory recitation of the territorial scope of U.S. patent enforcement.  *See* Patent Act of 1836, ch. 357, 5 Stat. 117 (repealed 1870).  Thus, when *Gardiner* analyzed the territorial scope of the patent law, it did so as a matter of common law, not statutory construction.  Cases have noted the dubious applicability of *Gardiner* to the current statutory language.  *See Decca*, 544 F.2d  at 1072-73; *Ocean Sci. & Eng'g, Inc. v. U.S.*, 595 F.2d 572, 573 (Ct. Cl. 1979).

Moreover, *Gardiner* actually supports the conclusion that the territorial scope of the current patent laws, as subsequently defined in § 100(c), does not

extend to ships outside U.S. territorial waters. *Gardiner* did not say that a U.S.-flagged ship is a "territory" of the United States; rather, it said that "jurisdiction extends to the decks of American vessels on the high seas, as much as it does to all of the territory of the country. . . ." 9 F. Cas. at 1158. This statement implicitly recognizes that American vessels are not *literally* "territories" of the United States. Rather, *Gardiner* merely restated the common-law metaphor that U.S.-flagged vessels are, sometimes and for some purposes, *like* U.S. territories. As discussed, cases such as *Cunard*, *Claussen* and *Scharrenberg* have held this metaphor inapplicable when interpreting the statutory term "territory."

Third, M-I argued that Congress must have intended to statutorily adopt *Gardiner* because 35 U.S.C. § 271(a) was "merely a codification of the common law of infringement that had developed up to the time of passage of the 1952 Patent Act." (Appx289 (quoting *NTP, Inc. v. Research in Motion, Ltd*, 418 F.3d 1282, 1319 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006)).) Even if M-I's "territory" argument were consistent with the holding of *Gardiner*, a single decision decided almost a century before the 1952 Patent Act does not qualify as a "clear expression" of congressional intent.

But, in fact, M-I's argument fails because its interpretation of "territory" is inconsistent with *Gardiner*. *Gardiner* expressly limited its holding to "American vessels on the high seas." 9 F. Cas. at 1158. *Gardiner* did not suggest that the

U.S. patent laws applied to a U.S.-flagged ship located in another country's jurisdictional waters. In fact, the language of *Gardiner* strongly suggests that the court would have reached a different result if the American vessel had been in foreign waters. Yet under M-I's interpretation of "territory" in § 100(c), U.S. patent law would apply wherever the ship was located, including in a foreign country's territorial waters and even rivers in the heart of a foreign country. In other words, adopting M-I's position would not codify the pre-1952 case law on infringement, but rather would substantially expand the territorial scope of infringement beyond even that of the inapposite and questionable *Gardiner* holding.

Fourth, M-I pointed to the legislative history of the Inventions in Outer Space Act, Pub. L. No. 101-580 (1990) (codified as 35 U.S.C. § 105) to regulate patent activities on spacecraft. However, statements by legislators in 1990 shed no light on what legislators intended 35 years earlier in connection with the 1952 Patent Act. *Massachusetts v. EPA*, 549 U.S. 497, 529-30 (2007); *Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) ("post-enactment legislative history is not only oxymoronic but inherently entitled to little weight"). Moreover, the legislative history of the Space Act does not state that the U.S. patent laws extend to U.S.-flagged ships. To the contrary, that legislative history expressly acknowledges the ongoing uncertainty regarding whether the Patent Act extends to

U.S.-flagged ships, discussing *Gardiner*, *Decca* and *Ocean Science*.  S. Rep. 101-266 (1990).  If anything, the fact that Congress recognized the uncertainty but did nothing to clarify it supports DAL's position, not M-I's.

Finally, M-I argued that refusing to interpret "territory" to include U.S. vessels creates "lawless patent zones" because a patent owner would have no recourse when a competitor infringes a U.S. patent aboard a U.S.-flagged ship in international waters.  The fact that there have only been a handful of cases (*Gardiner*, *Decca*, *Ocean Science*) in the last 150 years dealing with alleged infringement aboard a U.S.-flagged ship in international waters shows that there is not a real problem.

Also, it would be a rare ship and rare patent that only had a nexus with international waters.  Ships and equipment installed thereon are made on land, and a patent covering such products would be infringed by "making" or "selling" before the ship departs port.  As for the infringing act of "using," ships travel from territorial water to territorial water.  Whenever a ship is in a countries' territorial water, there is an infringing "use" in that country (as M-I has asserted through its lawsuit in Brazil).  *See Deepsouth*, 406 U.S. at 531 ("To the degree that the inventor needs protection in markets other than those of this country, the wording of 35 U.S.C. §§ 154 and 271 reveals a congressional intent to have him seek it abroad through patents secured in countries where his goods are being used.").

And even if there were a hole in the territorial reach of the U.S. patent laws, that would not be a basis to interpret the law contrary to its plain meaning. The Supreme Court was faced with a similar "loophole" argument regarding the territorial scope in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007). The Court responded that "we are not persuaded that dynamic judicial interpretation of § 271(f) is in order. The 'loophole,' in our judgment, is properly left for Congress to consider, and to close if it finds such action warranted." *Microsoft*, 550 U.S. at 457. The same is true here. If Congress wants to extend the patent laws to activity aboard U.S.-flagged ships, it can do so. But unless and until that happens, the territorial scope of the laws must be enforced as they are written.

## CONCLUSION

The district court correctly dismissed the suit against DAL for lack of personal jurisdiction.

Date:  August 8, 2016                    Respectfully submitted,


                                         *s/ J. Derek Vandenburgh*
                                         Alan G. Carlson
                                         J. Derek Vandenburgh
                                         Todd S. Werner
                                         Carlson, Caspers, Vandenburgh,
                                         Lindquist & Schuman
                                         225 South Sixth Street, Suite 4200
                                         Minneapolis, Minnesota 55402
                                         Telephone:  (612) 436-9600
                                         Facsimile: (612) 436-9605
                                         acarlson@carlsoncaspers.com
                                         dvandenburgh@carlsoncaspers.com
                                         twerner@carlsoncaspers.com

                                         COUNSEL FOR APPELLEES

## CERTIFICATE OF COMPLIANCE

Counsel for Appellee hereby certifies that:

1.      The brief complies with the type volume limitation of this Court because exclusive of the exempted portions it contains 13,976 words as counted by the word processing program used to prepare the brief; and

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2010 in a proportionately spaced typeface:  Times New Roman, font size 14.


Dated:  August 8, 2016

                                        s/ J. Derek Vandenburgh
                                        J. Derek Vandenburgh

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 8, 2016, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the appellage CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*s/ J. Derek Vandenburgh*
J. Derek Vandenburgh